Salvatore T. DeMatteo, J.
Despite the court’s exhaustive search and the commendable co-operation of counsel, the court, surprisingly, is unable to find a New York reported case like the one at bar.
Plaintiff seeks to recover the sum of $17,000 by reason of defendant’s refusal to honor a "stop payment” order on its cashier’s check.
The parties have waived trial by jury and their right to submit requests for finding of facts which the court finds as follows (CPLR 4213):
Irving A. Cook, Esq., plaintiff’s attorney, and Frank Monaco, defendant bank’s branch manager, testified for the respective parties. (Plaintiff was unable to appear at the trial due to a disabling illness which confined him at the Woodhull Care Center.) Except for the date the "stop order” was given, the evidence does not appear to be in dispute, with much of it in documentary form.
Prior to June 15, 1973, plaintiff (Dziurak), without his own attorney, orally agreed with one Mario Staveris (Staveris) that for $22,000 Dziurak would receive original-issue stock equivalent to a one-third interest in a corporate restaurant of which Staveris was president. The entire proceeds were to be deposited in the corporate account to be used solely for corporate purposes.
*642 After having paid Staveris $5,000, Dziurak, on (Friday) June 15, 1973, requested defendant’s branch to remove $17,000 from his savings account of $18,000 therein and to issue an official bank check in said amount to Staveris. Following a conversation with the branch manager relating to the above agreement, Dziurak heeded the manager’s advice to have the bank check payable to Dziurak’s order rather than to Staveris’ order. The check was drawn by the defendant on itself. Dziurak then signed the check in blank and delivered it to Staveris.
Dziurak learned that Staveris violated their agreement by depositing the check to Staveris’ individual savings account in the Green Point Savings Bank. Immediately, and during the afternoon banking hours of June 21, 1973, Dziurak and then Irving Cook, the attorney Dziurak had summoned for help, stated to the branch manager that Staveris had swindled Dziurak and they ordered him to stop payment on the check. The manager conceded the bank check had been received in the morning delivery and as yet had not been paid, but under advice of bank counsel, and expressly for lack of a court order, rejected plaintiffs stop-payment request.
The check shows that it was deposited by Staveris in the Green Point Savings Bank on June 18, 1973, was then forwarded to Chemical Bank for collection, and was received by defendant’s main office official check processing unit from Chemical via the New York Clearing House Exchanges on June 20, 1973. The check was then forwarded to Chase’s branch office, the drawer of the check, which received and paid it to Staveris on June 21, 1973.
Dziurak then sued Staveris and others in this court, alleging fraud. After a plenary trial Dziurak, on November 12, 1973, recovered a judgment against Staveris in the amount of $22,955. No appeal has been taken therefrom and execution thereon was returned wholly unsatisfied on December 24, 1973, after which plaintiff commenced this action.
Against this factual background the issue appears to be: Was the order to defendant by Dziurak to stop payment on its cashier’s check valid?
Defendant contends that the answer to this is in the negative. It relies, inter alia, upon a host of citations wherein judicial discourse is engaged in to create an aura of eternal precedent concerning the nature of a cashier’s check. The instrument in question is continually referred to as the equiv *643 alent of cash. It assumes the mere issuance of a check by the drawee bank gives rise to an executed sale of credit, not subject to rescission or countermand (see, e.g., International Firearms Co. v Kingston Trust Co., 6 NY2d 406; Rose Check Cash Serv. v Chemical Bank N. Y. Trust Co., 43 MisC 2d 679; Foreman v Martin, 6 Ill App 3d 599). In Rosenbaum v First Nat. City Bank of N. Y. (13 AD2d 100, 102), a precode case,[1] the instrument was defended in the following terms: "The requirements of stability in commerce and banking dictate that the obligations of a bank on its cashier’s checks be not lightly avoided.”
Within that class of citations, the payee is a bona fide retailer, and the check is drawn to his order as a third party. Malphrus v Home Sav. Bank of City of Albany (44 Misc 2d 705) is a case unduly applied by defendant to the one at bar. There, the purchaser gave to the plaintiff, as payee, a teller’s check, drawn by defendant, her savings bank, in part payment for a secondhand automobile. At the purchaser’s request the bank stopped payment.[2] Although the bank asserted that, as a "customer”, it had a right to stop payment under section 4-403 of the Uniform Commercial Code, the court granted summary judgment to the payee. Under section 3-802 (subd [1], par [a]) of the Uniform Commercial Code the buyer’s underlying obligation to the plaintiff seller is pro tanto discharged whenever a bank is "drawer, maker or acceptor” of the instrument given in payment without reservation of recourse against the buyer. Therefore, to permit the bank to withhold payment under section 4-403, would leave the seller with no enforceable rights against the underlying obligor (the actual consumer) or anyone else. Since the code is promulgated to protect a genuine transaction involving a quid pro quo between the remitter and payee, the premise of the Malphrus decision that section *644 3-802 discharges the remitter, is sound (see, also, Ruskin v Central Fed. Sav. & Loan Assn. of Nassau County, 3 UCC Reporting Serv 150 [NY Sup Ct, 1966]).
Defendant then argues that Kaufman v Chase Manhattan Bank (370 F Supp 276) decidedly represents the rule of law in its favor. Kaufman obviously enlarges upon the traits of a cashier’s check into a sweeping generic rule of public policy. It rehashes the timeworn maxim of labeling the cashier’s check as a primary obligation of a bank, equivalent to cash, its issuance constituting acceptance by the issuer. Kaufman reiterates verbatim the maxim of law asserted in National Newark & Essex Bank v Giordano (111 NJ Super 347, 352): "To allow the bank to stop payment on such an instrument would be inconsistent with the representation it makes in issuing the check. Such a rule would undermine the public confidence in the bank and its checks and thereby deprive the cashier’s check of the essential incident which makes it useful. People would no longer be willing to accept it as a substitute for cash if they could not be sure that there would be no difficulty in converting it into cash.”
The defendant adopts the intransigent position that unless Dziurak obtained injunctive relief, he was doomed the moment he gave the check to Staveris, even though Staveris gave no value.
There are some who would not be so inflexible when the holder is not a holder in due course.[3]
Whereas, the dictum in TPO Inc. v Federal Deposit Ins. Corp. (487 F2d 131, 135) represents a much more valid ap *645 proach in characterizing the cashier’s check as one of limited value in the emporium. It affirms the position taken by the authors of Willier and Hart in Bender’s Uniform Commercial Code Service Reporter Digest (vol 2, p 2-1194): "A bank may draw a cashier’s check either on itself or on another bank. When drawn on another bank, the check is governed by the same rules as any other check; when — as here — drawn by the bank on itself, the check is effective as a note under Section 3-118(a) with the bank as maker. Thus, the court erred in referring to the instrument as a draft which had been accepted. ” (Emphasis added.)
Circuit Judge Weis, speaking for the court in TPO (supra), continued at page 136 thereof: "In any event, while a cashier’s check is equivalent to a negotiable promissory note of a bank, it is not the same as cash as has been loosely asserted, and the cases discussing this particular type of instrument must be carefully analyzed”. (Emphasis added.)
To say that a cashier’s check is the equivalent of cash appears to be irreconcilable with section 4-104 (subd [1], par [g]) which defines "Item” as "any instrument for the payment of money * * * but does not include money.” Thus, one may argue that a cashier’s check is not money and therefore not cash. We embrace the practical view that until paid by a bank in due course a check is not absolute payment (3 Anderson, Uniform Commercial Code [2d ed], p 144).
Undoubtedly, the code intends to protect the bank customer’s use of instruments for the payment of money when it states, in relevant part, at section 4-403: "(1) A customer may by order to his bank stop payment of any item payable for his account”.[4] A liberal interpretation by the court is intended as suggested in the following official comments to the section as well as by others.[5]
*646 "2. The position taken by this section is that stopping payment is a service which depositors expect and are entitled to receive from banks notwithstanding its difficulty, inconvenience and expense. The inevitable occasional losses through failure to stop should be borne by the banks as a cost of the business of banking.”
Absent "certification of a check or other acceptance” (Official Comment 5) "the right to stop payment is not limited to checks, and extends to any item payable by any bank.” (Official Comment 4.)
"Customer” is defined as "any person having an account with a bank or for whom a bank has agreed to collect items (Uniform Commercial Code, § 4-104, subd [1], par [e]); and "account” is "any account with a bank and includes a checking, time, interest or savings account” (§ 4-104, subd [1], par [a]). Again, "item” means "any instrument for the payment of money * * * but does not include money” (§ 4-104, subd [1], Par [g]).
The depositor is the prime, dominating influence mainly responsible for the growth and development of the banking system. The influx of his funds serves as a conduit to the source from which business loans are poured into the mainstream of American capitalism. The code seeks to shelter this essential, economic entity, fundamental to the survival of the banking industry.
While we are aware of foreign case law to the contrary,[6] the obvious broad scope of the statute and the logic of the Official Comments clearly manifest that Dziurak is a customer and the cashier’s check an item payable for his account.
With this salutary intendment for the bank customer in mind we question as tenuous defendant’s contention that the item had already been accepted upon the act of issuance under subdivision (1) of section 3-410, and therefore no stop-payment order could be valid under section 4-303 (subd [1], par [a]).
*647 We have already noted some challenges to this oft-repeated argument. What, in reality, do we have here? Dziurak had paid the defendant for the cashier’s check from his savings account in defendant’s branch; hence, at the time of issuance, the check represented Dziurak’s proceeds. Defendant undertook an absolute obligation to dispose the same and give an account for their disposition. If the unsophisticated Dziurak is denied the right to stop payment once he negotiates it, it would be less than fair if the risk of instantaneous, irrevocable loss should not be made unmistakably clear to him. If, and so it seems, "acceptance” equates finality, the issuing bank should be held to strict compliance of section 3-410, especially since the statute fails to express or imply that a cashier’s check is accepted, upon issuance. The "drawee’s signed engagement to honor the draft as presented * * * must be written on the draft, and may consist of his signature alone.” (§ 3-410, subd [1].) Here, this is lacking. The check was signed by the bank once and where the drawer normally signs. Our attention is invited to Official Comment 4 of section 3-410 "the mere signature of the drawee on the instrument is a sufficient acceptance. Customarily the signature is written vertically across the face of the instrument; but since the drawee has no reason to sign for any other purpose his signature in any other place * * * of the instrument, is sufficient.” (Emphasis added.) Thus, the statute and Official Comment make clear that the drawee’s signature must appear for the sole reason and for no other purpose but to accept the instrument. Moreover, subdivision (1) of section 3-104 provides that "[a]ny writing to be a negotiable instrument within this Article must (a) be signed by the maker or drawer. ” (Emphasis added.) We hold that the cashier’s check was a completed negotiable instrument by reason of defendant’s signature as drawer.[7] To judicially hold that when a bank wears two hats, its one signature affixed where the drawer normally signs, fulfills two purposes, that of drawer and drawee, and thereby, ipso jure, transforms a cashier’s check into an "accepted” check is, in light of statutory silence and the Official Comments, tantamount to judicial wrenching of the legislative arm.
*648 Whereas, the cashier’s check herein is equivalent to a note by reason of subdivision (a) of section 3-118 "A draft drawn on the drawer is effective as a note.”
While we agree to a considerable extent with the defendant with the warranted significance the courts have attached to the use of a cashier’s check (and to bank instruments generally) in promoting economic stability, we are of the opinion that they are universal favorites because they cannot be dishonored for insufficient funds.
Absent the inviolability of a certified check or "accepted” draft, it is critical to the basic issue in the use of other instruments to consider the parties to the instrument and the underlying quid pro quo as the instrument travels the negotiation route — no less than the courts cited by the defendant have done. There are factual disparities in this case from the others the defendant cites. For example, plaintiff is defendant’s customer and payee on the check. He gave it to one (Staveris) who gave no value for it. Therefore, Staveris is not entitled to the statutory benefits of a holder in due course (Uniform Commercial Code, §§ 3-302, 3-303, 3-306). No innocent person or genuine transaction is involved. The discharge of an underlying obligation under section 3-802 is lacking.
Moreover, by withholding payment no innocent person would suffer. In addition, the defendant, as a stakeholder, could easily insulate itself from any difficulty and without any loss and with dispatch.[8] Instead, by paying Staveris, defendant chose to get involved, and enabled Staveris and, with him, to literally squeeze Dziurak to his financial extinction.
With respect to defendant’s request that plaintiff obtain injunctive relief as a condition to stopping payment, since no action was then pending, plaintiff could not enjoin "payment by order of a court in an action in which the adverse claimant (Dziurak) and the holder (Staveris) are parties.” (Uniform Commercial Code, § 3-603, subd [1].)
Undoubtedly, any attempt by plaintiff to supply "indemnity deemed adequate” to defendant (which defendant had not
*649 requested), would prove fruitless since plaintiffs stop-order was given during the imminence of bank closing hours. We believe that if adequate security is to be furnished, that adequate time be furnished within which to provide that security, particularly if there is no wrongdoing on the part of the adverse claimant. Also, since the bank manager had proffered Dziurak to have the check payable to his order, in heeding the advice, Dziurak apparently relied on the manager’s trustworthiness and his concern as well as the bank manager’s sophistication with bank instruments. Because of the bank-customer relationship in the above circumstances, it would appear that if the bank manager wanted or expected security from Dziurak that there was an obligation on the manager to demand the same and thus alert Dziurak to furnish the security. In not requesting the security, defendant is deemed to have waived the provision that was for its benefit. We allude to CPLR 1006 wherein, without a court order or security, defendant could have withheld payment and insulated itself in interpleader.
We touch now on defendant’s next contention. Even assuming, arguendo, plaintiff was covered by a binding stop order in accordance with subdivision (1) of section 4-403 of the Uniform Commercial Code, defendant now postulates that plaintiffs rescission comes too late, as provided by statute. Section 4-303 absolves a bank when the stop order is received and a reasonable time for the bank to act thereon expires after the bank has accepted or certified; paid; settled for; completed posting; or became accountable for the item. This court finds none of these defenses to be valid. Defendant had ample time to “return the item or send notice of dishonor” before "its midnight deadline” (§ 4-302, subd [a]; § 3-508, subd [2]; § 4-104, subd [1], par [h]; see, also, Tusso v Security Nat. Bank, 76 Misc 2d 12).
Defendant’s last contention that by suing Staveris plaintiff elected his remedies, is untenable, in view of the requirements of subdivision (3) of section 4-403 which puts the burden on the customer to prove the loss and amount thereof before any recovery can be had against his bank for paying an item contrary to a binding stop-payment order.
Dziurak, the customer, was not given the protection by the bank he enriched which it was obliged to give, “notwithstanding its difficulty, inconvenience or expense.” It seems eminently fair that a bank that can insulate itself without "diffi *650 culty, inconvenience or expense” be held to walk a tightrope. Had the defendant honored the stop-payment order so that a reasonable opportunity would be given to Dziurak to protect his funds against a dishonest holder, a lasting harm would have been avoided. Had this occurred, it is doubtful our economy would have suffered a trickle or a cashier’s check would lose whatever glamor it now possesses and thus come into disuse.
Perhaps the role of the cashier’s check in promoting economic stability has been overplayed, vis-á-vis the ordinary check. Do we abolish the latter because it lacks "sacrosanct” qualities? Economic stability, worldwide, would be naught without it. The evidence is overwhelming that this is so because drawers of ordinary checks promote their self-interest by honoring their obligations. What we are trying to say is: Adverse claims are relatively few. When they seek to arrest thieves, commerce flows smoothly. One who claims that a holder has given no value and has committed fraud and therefore is not entitled to his proceeds, should be given the opportunity to willingly expend his money, effort and time to prove it in court.
In sum, stripped of the jargonistic mumbo jumbo which conflicting statutory and case law and legal scholars have brought to the legal arena involving cashier’s checks, it is crystal clear that at this juncture of our case, because of defendant’s behavior, Dziurak lost his money, the defendant lost Dziurak as a customer, and Staveris — well, as for him, he was lucky he was given a cashier’s check and not an ordinary check, for his fraud paid off. To us, this is not ratio legis.[9]
Defendant’s motions to dismiss, hereinbefore reserved, are denied.
The court finds plaintiff’s case satisfactorily establishes the fact and amount of his loss. Judgment for plaintiff in the sum of $17,000 together with interest from June 21, 1973.

. All sections cited are under the Uniform Commercial Code adopted by New York in 1962, effective September 27, 1964. All underlining is ours for emphasis.

. In most instances relating to teller’s checks and other bank instruments, it is the remitter or purchaser and not the bank that has an interest in stopping payment. In many cases the bank satisfies its depositors by acceding to their request to stop payment. In the case of a teller’s check, for example, the remitter has no apparent right to stop payment under section 4-403; it can be argued that he is not a customer of the drawee bank which is charged with the payment of the item. A bank instrument drawn on another bank gives the drawer the right to stop payment. Under section 4-104 (subd [1], par [e]) "Customer” is defined to include "a bank carrying an account with another bank” and under section 4-403, a customer may stop payment on any instrument payable for his account. However, if the drawer stops payment, it remains liable on the instrument.

. See Michie on Banks and Banking (Vol 6, p 372) "Although there are cases to the contrary, generally cashier’s checks are not subject to countermand except for fraud, and are irrevocable in the hands of a holder in due course. ” (Emphasis added.) See, also, Ross v Peck Iron & Metal Co. (264 F2d 262, 269) "Since the law is perfectly clear that a cashier’s check cannot legally be countermanded or dishonored when presented by a holder in due course. ” (Emphasis added.) See Leo Syntax Auto Sales v Peoples Bank & Sav. Co. (6 Ohio Misc 226; 35 Ohio Opns 2d 330) where one Lentz procured from defendant bank a $1,500 cashier’s check to his own order and negotiated the instrument to plaintiff in payment of a used car. Lentz ordered the bank to dishonor the check and the bank complied. In denying plaintiffs motion to strike the defense of its status as a holder in due course, the court took the anomalous* position that although Lentz had no right to stop payment as the check was accepted when drawn, the bank could voluntarily* dishonor at Lentz’ request provided plaintiff was not a holder in due course, in which case any defense Lentz had against the plaintiff was available to the bank.

(* Under section 4-303 an "accepted” item cannot be voluntarily dishonored by the bank.)

. The section goes beyond the prior NIL rule that the drawer of a personal check has the right to stop payment. It gives the "customer” of a bank a right to stop payment on "any item payable for his account.” Incontrovertibly, a cashier’s check is an instrument for the payment of money and is an "item” under section 4-104 (subd [l],par[g]).

. See Personal Money Orders and Teller’s Checks: Mavericks Under the UCC, 67 Col L Rev 524, 533-534: "It is arguable that the drafters of the Code intended to restrict the right to stop payment to persons who maintain a continuing relationship with the bank, excluding the purchaser of a single instrument. On the other hand, cases concerning the meaning of the term 'account’ — all decided prior to the Code— construed it as encompassing any debtor-creditor relationship between a bank and one who deposits money with it for any purpose. (See, e.g., Peter Kiewit Sons, Inc. v.
*646 County of Douglas, 172 Neb. 710, 715, 111 N.W. 2d 734, 738 [1961].) Furthermore, the official comments to section 4-403 employ the terms ’depositor’ and ’drawer’ interchangeably with ’customer’, indicating that the section should not be read to exclude the purchaser of a personal money order. Since leaving stop payment orders to the discretion of the banks would impair the utility of these instruments as the 'poor man’s checking account,’ a broad interpretation of section 4-403 should prevail.”

. E.g., Wertz v Richardson Hgts. Bank & Trust (495 SW2d 572 [Tex]) holds that a cashier’s check is payable for the bank’s account.

. We are mindful of subdivision (2) of section 3-410: "A draft may be accepted although it has not been signed by the drawer or is otherwise incomplete”. (Emphasis added.) While the quoted provision appears to be inconsistent with section 3-104 (subd [1], par [a]), the legislative intent clearly refers it to an instrument which has not been signed by the drawer or is (otherwise) incomplete in some other manner. Here, the cashier’s check was signed by the drawer and is complete.

. The common-law doctrine of adverse claim and jus terti which enabled a party who is obligated on an instrument to raise a defense based upon the rights of a third person have been perpetuated by the code so that the drawee is spared the necessity of deciding the merits of a customer’s adverse claim at the peril of double liability (§§ 3-306, 3-603). Moreover, under CPLR 1006 (interpleader) and 2601, the defendant comes within the definition of a stakeholder and it can easily insulate itself without difficulty or expense against the exposure of multiple liability.

. The reason for enacting a law.