In re SINGER PRODUCTS COMPANY, INC., Guiterman Co., Inc., and Cinefot Overseas Corp., Debtors.

SINGER PRODUCTS COMPANY, INC., as Debtor–in–Possession, Plaintiff,

v.

FIRST AMERICAN BANK OF NEW YORK, Defendant.

CHEMICAL BANK, Third Party Plaintiff–Intervenor,

v.

FIRST AMERICAN BANK OF NEW YORK, Third Party Defendant.

Bankruptcy Nos. 186–61677 to 186–61679.

Adv. No. 187–0060.

United States Bankruptcy Court, E.D. New York.

Aug. 8, 1989.

914

Salomon, Green & Ostrow by Chester B. Salomon and Nicholas Kajon, and Morgan, Lewis & Bockius by Gerald Freedman, New York City, for debtors.

Zalkin, Rodin & Goodman by Andrew D. Gottfried and Neil E. Herman, New York City, for Chemical Bank.

Dechert, Price & Rhoads by Paul F. Helfer and Karen G. Turner, New York City, for First American Bank of New York.

Rosenberg, Rosenberg & Koral by Louis Rosenberg, Brooklyn, N.Y., for Creditors' Committee.

## DECISION

MARVIN A. HOLLAND, Bankruptcy Judge:

For many years prior to the filing of this case on August 27, 1986, Singer and Chemical Bank enjoyed a healthy banking relationship. Chemical was both depository bank and lender to Singer and as of the filing date Singer was indebted to Chemical in excess of $3,000,000, including contingent liabilities. These obligations were secured by, *inter alia,* all of Singer's present and future personal property, including accounts receivable, inventory, contract rights, documents, instrument, general intangibles and proceeds.

On or about March 11, 1986 Singer obtained two lines of credit from First American Bank of New York ("FABNY"); one denominated "secured" in the amount of $4 million secured by "documentary collection items", and one denominated as "unsecured" in the amount of $1 million.

In setting up the unsecured line, Singer executed FABNY'S printed boiler plate security agreement which sought to cross collateralize all of Singer's obligations by defining the obligation secured thereby as any obligation whatsoever owed by Singer to FABNY.

This cross-collateralization provision was never used by FABNY until shortly prior to Singer's filing when FABNY first discovered Singer's financial difficulties. FABNY maintains that the cross-collateralization agreement was intended to be operative from its inception. Singer maintains that it was never intended to become operative.

This decision addresses the scope of FABNY's security, the manner by which the "documentary collection" proceeds were generated, the priorities which arose incidental thereto, the apparently conflicting priorities between Chemical and FABNY, and the extent to which 11 U.S.C. § 547 (Preferences) impacts upon FABNY's unilateral allocation of these proceeds among both lines of credit.

## PROCEDURAL HISTORY

On August 27, 1986 the debtors, Singer Products Company, Inc. and its subsidiaries Guiterman Co., Inc., and Cinefot Overseas Corp. (hereinafter "Singer"), filed their respective Chapter 11 petitions in bankruptcy. On March 4, 1987, Singer initiated this adversary proceeding by filing a complaint against FABNY, asserting claims under sections 542, 547 and 553 of the Bankruptcy Code (hereinafter "Code").

The complaint alleges that Singer and FABNY entered into an agreement obligating FABNY to create for Singer two separate credit facilities, one unsecured, the other secured. Singer alleges that in or about March, 1986, FABNY advanced the sum of $1,000,000.00 on the unsecured line of credit, and between June 1, 1986 and the filing date drew down [1] the sum of approximately $316,194.94 against that outstanding balance. Singer also alleges that on or about April 8, 1986 and June 4, 1986 FABNY advanced the sums of $400,000.00 and $175,000.00 on the secured line of credit and thereafter drew down the sum of approximately $272,590.72. Based upon these draw-downs, Singer maintains that FABNY obtained a preference in the amount of $588,785.66 since FABNY's security interests were not secured until it filed its financing statements on June 25, 1986, well within 90 days of Singer's filing. Singer also alleges that since the draw-downs were applied against the proceeds of liquidated accounts receivable and inventory, FABNY's right to these proceeds were subordinate to Chemical's prior lien upon Singer's accounts receivable and inventory. Singer therefore requests a turnover of both pre and post-petition proceeds of accounts receivable and inventory pursuant to Code §§ 542 and 549. Singer also requests an accounting and turnover of all collections received by FABNY post-petition.

FABNY answered the complaint averring that the sums collected by it pre-petition are not voidable preferences; and to the extent that they might otherwise be so, they fall squarely within the exceptions outlined in § 547(c).

Chemical Bank then moved to intervene as a party plaintiff claiming a superior interest in Singer's accounts receivable and inventory pursuant to New York Uniform Commercial Code ("NYUCC") § 9–312 as a prior in time financier, and sought to assert claims against FABNY for conversion, money had and received, and to impose a trust upon all funds collected by FABNY alleged to be the proceeds of Singer's accounts receivable and inventory. Singer's Unsecured Creditors' Committee also sought to intervene as a party plaintiff.

Both motions to intervene were granted.

Chemical's complaint sought in addition to the claims discussed above, the first $220,000.00 of any net recovery Singer might obtain from FABNY.[2]

FABNY's original answer claimed that it, and not Chemical, had the superior interest in Singer's "accounts receivable, inventory and proceeds", claiming that as a "collecting bank", it had security in the ac-

---

1. Draw-down is defined as the process by which proceeds of overseas sales are applied by FABNY to reduce Singer's then current outstanding loan balances.

2. Pursuant to a stipulation entered into between Singer Products Company, Inc. and Chemical Bank, which was "consented to" by the Creditors' Committee, and dated December 30, 1986, this court approved an order "approving settlement of controversy, authorizing debtors to grant a super priority and replacement liens, and authorizing debtors to incur unsecured debt allowable as an administrative expense." The substance of their settlement and compromise provided for, pursuant to 11 U.S.C. § 346(c)(1) and (c)(2), Chemical's consent to Singer's use of its cash collateral to the extent of $220,000.00. In exchange thereto, Singer granted Chemical, *inter alia*—

> a security interest in the first $220,000 of (x) any net preference recoveries brought by the debtors or any successor trustee pursuant to Section 547 of the Bankruptcy Code.

Order approving settlement and compromise, Case Docket # 62. This order approving compromise, Chemical alleges, provides for retainage by it of the first $220,000.00 of any net recovery Singer might have as against FABNY. Singer concedes Chemical's entitlement but only to the extent of $170,000.00, representing the amounts of cash collateral actually utilized by Singer pursuant to this December 30, 1986 stipulation.

counts receivable, inventory and proceeds thereof superior to any security previously granted to Chemical.

Singer answered Chemical's third party complaint admitting Chemical's entitlement only to the first $170,000.00 which Singer might obtain from FABNY maintaining that this was the only amount Singer had utilized under Chemical's cash collateral order dated December 30, 1986.[3]

FABNY then sought to amend its answer to paragraph 4 of Chemical's complaint.[4] FABNY alleged that after further review of its files, it had discovered that its original answer might not have adequately pleaded FABNY's right to apply the proceeds of its collateral to Singer's unsecured balance, and maintained for the first time that Singer's so-called unsecured line of credit had always been secured by virtue of the cross-collateralization provision contained in the security agreement.

Singer urged the court not to permit the amendment, arguing that FABNY could not sustain this newly-taken position because it was contradicted by documents in FABNY's loan files. Singer pointed, for example, to the "line of credit agreement" on the stationery of Robert Montano, a Vice President of FABNY, which stated:

> [i]t is a pleasure to inform you that FABNY holds available to Singer Products Company a $4,000,000 secured line of credit for short term working capital loans and a $1,000,000 unsecured line of credit for short term working capital loans,

and which at paragraph three further provides—

> [i]nterest on the principal balance of borrowing from time to time outstanding hereunder shall be calculated with respect to each advance made to you by us at a fluctuating rate which is equal to one-quarter percent ($\frac{1}{4}$%) in excess of our 'base rate' for unsecured lending and the base rate for secured lending.

Singer argued that the contents of this letter agreement and FABNY's other documents were indicative of its intent to provide Singer with an unsecured line of credit.

FABNY's motion to amend was granted without a ruling on the sufficiency of its legal arguments which were preserved and are now under consideration in these motions and cross-motions for summary judgment now before the court.

FABNY's claimed security upon Singer's "Documentary Collection items," outlined in the "Security Agreement for Own Obligations" ("Security Agreement") arose in the following fashion. Singer sold its product overseas. When it shipped its product it would transmit documents of title together with written collection instructions to an overseas bank selected exclusively by Singer. Accompanying these instructions would be a draft. The collection instructions to the overseas bank consisted of a FABNY form obtained by Singer from FABNY which Singer would complete either by filling in blanks, or by checking appropriate alternatives. Depending upon

---

**3.** See footnote 2, *supra*.

**4.** Singer's complaint dated March 4, 1987 avers at paragraph 4 that—

> [b]y agreement, dated March 11, 1986, defendant agreed to advance moneys to the debtor by two credit facilities consisting of (a) an unsecured revolving line of credit and (b) a secured revolving line of credit.

FABNY's answer "admits" to this paragraph. By *motion dated May 12, 1988* FABNY sought leave to amend its answer to the complaint, particularly as noted above, which this court granted by order dated May 27, 1988. The amended answer, dated June 1, 1988, now alleges—

> [a]dmitted in part. FABNY made available to the Debtor two financial accommodations.

The first was under an "unsecured" note attached to the Answer as Exhibit "A", which Note required no delivery of collateral to the Bank as a prerequisite to borrowings thereunder. The second was under a secured note attached to the Answer as Exhibit "B", which required the Debtor to make available to FABNY a pool of collateral, and permitted borrowings in the amount not to exceed 75% of the pool. The security interest under the secured Note was evidenced by a Security Agreement attached to the Answer as Exhibit "C". The Security Agreement provided, upon the liquidation of collateral or disposition of the proceeds thereof, that the collateral would secure both obligations, and that the proceeds thereof could be applied to either note.

the manner by which Singer completed this form prior to sending it to the overseas bank, some of the drafts would be payable on sight while others would be payable some time after acceptance. The overseas bank sometimes would be authorized to deliver the documents of title upon acceptance of the draft, and at other times delivery would be authorized only upon its payment by the customer to the overseas bank. The accompanying draft, however, was always payable to FABNY, at least with regard to the exhibits submitted on these summary judgment motions.

Although FABNY was named payee, neither the draft nor the collecting instructions given by Singer to the overseas bank indicated whether payment to FABNY was intended to be for the benefit of FABNY or whether remittance to FABNY would be as Singer's depository bank and there is nothing before the court to indicate that any of the overseas customers or overseas banks ever were aware of the lending or security arrangements had between Singer and FABNY. Although it is unclear why, a substantial number of remittances from these overseas bank appear to have been made directly to Singer unrestricted in form. While this could have enabled Singer to use these funds for its own purpose had it chosen this course, Singer never did so. Rather, Singer, voluntarily and without demand by FABNY, forwarded these receipts to FABNY sometimes as they came in and sometimes only after accumulating a number of these receipts in their deposit account at FABNY.

Transcripts submitted by the parties substantiates this finding. At pages 145–146 of the transcript of Singer's assistant controller, Demsky, annexed as an exhibit to Robert Cohen's affidavit in response to these motions for summary judgment [docket sheet document # 36], Demsky states that

> ... the other controller, Adella Gulo, maintained a worksheet on which she summarized collections that came into Singer Products that would eventually be returned to First American Bank.

Page 38 of that transcript, which appears as exhibit J to Mr. Cohen's affirmation in support of FABNY's motion for summary judgment herein [docket sheet document # 27] contains his statement at line 12, that

> ... the bookkeeper would accumulate proceeds from foreign collection items on a worksheet pad and at one point, when that total reached the $150,000 mark, a check was then cut and remitted to First American Bank.

It would thus appear that Singer had received these remittances directly from the overseas collecting banks, although there is nothing in any of the papers submitted in connection with the pending motions to preclude the possibility that these moneys were received by FABNY, credited to Singer's account, and then paid by Singer back to FABNY in repayment of its outstanding obligations. There is no claim, however, but that to the extent that Singer may have received any such payments directly, full and prompt remittances were made to FABNY.

FABNY's amended answer admits the existence of two financial accommodations: one unsecured and one secured, but asserts that the security agreement indicates that all collateral would serve *both* obligations, and that the proceeds of any collateral could be applied by FABNY to either line. The interpretation and effect of this security agreement is one of the issues to be resolved, *to wit,* whether under the security agreement the collateral effectively secured both obligations, as FABNY would have us believe, or only the $4 million secured line, as urged by Chemical and Singer.

All parties have now moved for summary judgment. Chemical requests summary judgment for $836,252.00, its current outstanding balance as against Singer based upon a series of security agreements. Chemical requests judgment against FABNY for wrongfully acquiring Chemical's security, arguing that its security agreement was first in time and provided for a blanket interest in all of Singer's assets, including accounts receivable and inventory. Chemical maintains that it is entitled

to recover from FABNY all credits and collections emanating from Singer's accounts receivable and inventory up to its current outstanding loan balance.

Chemical points out that FABNY had not only constructive notice of Chemical's security interest in Singer's assets but actual notice as well. Early in 1986 Singer had been solicited by FABNY's employee, Montano, for the primary purpose of establishing a lending relationship with FABNY. Prior to his employment with FABNY, Montano had been an employee of Chemical, working on the Singer account. Although FABNY knew about Chemical's secured relationship with Singer, it nevertheless chose to secure its loans to Singer by assets already secured to Chemical. Chemical therefore maintains that the burden on loss must fall on FABNY.

Chemical further maintains that FABNY's claim to security upon "documentary collection items" rather than upon accounts receivable and inventory is also defective. The security agreement states that FABNY's collateral shall include "documentary collection items presented *through* FABNY for payment." Chemical maintains that since "[S]inger delivered all original documents of title, bills of lading, invoices, drafts and correspondence directly to foreign correspondent banks," there were no "documentary collections items presented through FABNY for payment" upon which FABNY's security could attach. (Chemical's notice of motion for summary judgment; affidavit of Neil Herman at 4.)

Chemical urges that the parties intended to enter into nothing more than a "lockbox" type arrangement, whereby proceeds of accounts receivable and inventory would be stored in Singer's account at FABNY; and not the one implemented by FABNY on the eve of Singer's petition, where FABNY would draw down against these proceeds as they came in, unilaterally applying them against outstanding loan balances. Chemical also urges us to hold that even if FABNY were otherwise secured in the documentary collection items, FABNY was not a "collecting bank" secured in such items

"to the extent of such advances" on these items.

As a final argument, Chemical points out that FABNY also claims a security interest in "merchandise, accounts receivable, and inventory" although FABNY's security agreement with Singer does not provide for this type of security.

Singer's motion for summary judgment against FABNY has four prongs: first, as to drawdowns made by FABNY to credit Singer's unsecured line, Singer maintains that the cross-collateralization provision contained in the security agreement is ineffective since it was never intended by the parties to take effect. Therefore, application of these moneys as credits to Singer's unsecured line within 90 days of the filing are preferential. Second, as to FABNY's claimed secured status perfected solely by the filing of the UCC financing statement, since that perfection was more than ten days after its creation and subsequent to 90 days prior to the filing of Singer's petition, such perfection is preferential. Third, with regard to FABNY's claimed perfection of security upon negotiable bills of exchange or bills of lading by possession pursuant to NYUCC Article 9, Singer argues that FABNY was never in possession of the original of these documents and that those entities in possession of the originals were not agents of FABNY such that their possession would constitute possession by FABNY sufficient to constitute perfection pursuant to Article 9. Fourth, Singer maintains that FABNY was not a "collecting bank" entitled to the protections afforded by NYUCC Article 4 since it never had the possession of these documents required by NYUCC §§ 4–208(1) and (3).

## DISCUSSION

### THE SCOPE OF FABNY'S SECURITY— CREDITS TO THE UNSECURED LINE AS PREFERENCES

The first issue to be resolved is whether FABNY is secured on only the $4 million line of Singer's credit denominated "secured", as claimed by Singer or whether the cross-collateral provisions of their security agreement successfully spreads the

lien to the $1 million line denominated "unsecured", as claimed by FABNY.

FABNY points to the Security Agreement to show that all liabilities, however denominated by the parties, were intended to be collateralized by all of Singer's assets. This agreement, particularly the subsection entitled "Grant of Security Interest", describes the collateral by stating—

[a]s collateral security for the payment when due of *all obligations*, as defined below, obligor hereby pledges, assigns and transfers to Bank and grants to Bank a continuing lien upon and security interest in all of Obligor's rights, title and interest now owned or hereafter acquired in

{x}—Documentary collection items presented for payment through the bank and;

{x}—Deposit Demand Account 550-014-785.

(Security agreement at 1) (emphasis added)

"Obligations" is defined in I(B) of the Security Agreement to mean—

all present and future loans, advances, debts, liabilities, extensions of credit, covenants, duties and other obligations to obligor or owing by obligor to Bank, whether direct, indirect, liquidated, unliquidated, fixed, contingent or howsoever arising whether now existing or hereafter incurred to or otherwise acquired by Bank, whether or not evidenced by any document, and whether held for Obligor's account or for other loans.... The obligations shall include new and additional credit facilities for obligor, whether or not such facilities are presently contemplated.

(Security Agreement at 2).

FABNY maintains, therefore, that although the unsecured note did not specifically refer to the security agreement, this self operating provision serves to secure the otherwise "unsecured" note. Although the original agreement to lend, the unsecured loan note, and the financing agreement are each unambiguous by itself, they are inconsistent with each other. At issue is whether printed boilerplate language in

the single security agreement effectively nullifies the letters, agreements, acts, and expressions of both parties which manifest a contrary intent.

Singer points out that the secured note and secured credit facility make mention of the security agreement and its application, while the unsecured note and unsecured facility do not. This, Singer maintains, belies FABNY's contention that it was the intent of the parties to preserve two lines of credit for "borrowing purposes only" but otherwise to preserve both lines as fully secured by all of Singer's assets. Singer emphasizes the fact that the interest rate charged on the "secured" loan was at prime, whereas the interest rate on the "unsecured" loan was at prime plus ¼%, attributing the increased rate to increased risks inherent in unsecured financing. Singer also claims that numerous internal memoranda kept by FABNY manifest an intent to maintain two separate lines: one secured and one unsecured.

For instance, Singer points to a letter agreement, dated March 11, 1986, addressed to Mr. P.F. Soricello—Vice President—Finance of Singer, from Robert L. Montano, containing the signature of Soricello "agreeing and accepting" this letter agreement, which states—

[i]t is a pleasure to inform you that First American Bank of New York holds available to Singer Products Company a $4,000,000 secured revolving line of credit and a *$1,000,000 unsecured line* of credit for short-term working capital loans. This letter is to confirm our understanding as to the terms and conditions under which borrowing under the *lines* ... will be arranged, processed and documented. (emphasis added)

Paragraph 11 of that agreement states:

[p]ertaining to the $4,000,000 secured line of credit, borrowing may be made on the basis of up to 75% of the aggregate value of documentary collections, not more than 60 days past due, which has been presented for collection through the bank,

memorializing the understanding of both parties that the $1,000,000 line was not

intended to be secured since this language is inconsistent with an intent that both lines were intended to be secured.

That the document entitled "Line of Credit Letter" is on its face an agreement intended by the parties to create a binding obligation is beyond doubt. Its first full paragraph begins by stating "During the life of this agreement...." Paragraph 2 begins by stating "Each borrowing hereunder", obviously referring to the within agreement. Paragraph 7 begins by stating "All payments by you hereunder...." Paragraph 8—"The Lines of Credit under this agreement...." Paragraph 10—"So long as this agreement...." Paragraph 13—"This agreement shall...." And lastly, the document calls for the signature of an authorized representative of both Singer and FABNY, and bears signatures of Soricello indicating Singer's intent to be bound by the agreement together with the signature of Montano on behalf of FABNY. Clearly, the document unambiguously set forth the mutual rights and obligations created thereby. Therefore this "agreement", drafted and signed by an authorized representative of FABNY and signed by Singer, manifested the parties' intent to be bound by its contents therein. *See Liamuiga Tours v. Travel Impressions, Ltd.,* 617 F.Supp. 920, 926 (E.D.N.Y.1985) ("It is incredible to contend that a document detailing duties and obligations, denominated as agreement, and executed at the request of the party that now seeks to disavow it is a mere manual.")

FABNY has never maintained that this "letter "agreement" is anything other than a binding contractual arrangement, nor has it ever argued that such agreement has been superseded by the security agreement. *See Cibro Petroleum Products v. Sohio Alaska Petroleum,* 602 F.Supp. 1520, 1531 n. 12 (N.D.N.Y.1985), *aff'd on other grounds,* 798 F.2d 1421 (Temporary Emergency Court of Appeals), *cert. denied,* 479 U.S. 979, 107 S.Ct. 562, 93 L.Ed.2d 568 (1986); *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.,* 284 F.Supp. 987 (S.D.N.Y. 1968). Rather, FABNY concedes that the line of credit letter agreement is a pertinent and relevant document outlining the parties contractual obligations. ("[t]he operative documents signed by the parties, the Commitment letter and the Security Agreement....") (FABNY's reply memorandum to Summary Judgment Motion of Singer and Chemical at 4.)

██ Interpretation is governed by the parties's intent which is to be determined by reference to all the relevant circumstances, rather than solely by reference to the terms of the agreement. *Lowell v. Twin Disc, Inc.,* 527 F.2d 767, 770 (2d Cir.1975); *Kurz v. United States,* 156 F.Supp. 99, 103–04 (S.D.N.Y.1957), *aff'd,* 254 F.2d 811 (2d Cir.1958). Since neither party has proffered any evidence to indicate whether either contract was intended to supersede the other, and as these two agreements were executed in close succession (two days apart), by the same parties, concerning the same subject matter, New York law mandates that we read and interpret them together as one, *Liamuiga Tours,* 617 F.Supp. 920, 927; *Evans Products Co. v. Decker,* 52 A.D.2d 991, 383 N.Y.S.2d 457, 459 (Franklin Co. App.Div., 1976), as if these parties intended such a result. *Lowell,* 527 F.2d 767 at 769; *Dynamics Corp. of America v. International Harvester Co.,* 429 F.Supp. 341, 346 (S.D. N.Y.1977); *Commissioner v. LaGierse,* 110 F.2d 734, 735 (2d Cir.1940), *rev'd on other grounds,* 312 U.S. 531, 61 S.Ct. 646, 85 L.Ed. 996 (1941). This, however, results in an inconsistency.

Singer cites to *Prescott, Ball & Turben v. LTV Corp.,* 531 F.Supp. 213 (S.D.N.Y. 1981), in support of its position that New York law requires us to resolve ambiguities against the party who drafted the agreement, *accord, Stern v. Satra Corp.,* 539 F.2d 1305, 1310–12 (2d Cir.1976), and requests this court to find that although the security agreement makes reference to "all obligations" as being collateralized, since FABNY drafted the letter agreement, signed it, and requested and obtained its binding approval from a Singer representative, it is as "... clear as a mountain lake in springtime", *Stern,* 539 F.2d 1305 at 1309, that two lines of credit, one secured the other unsecured, were intended by the

parties. Citing to, *inter alia, Cale Development Co. v. Conciliation and Appeals Board*, 94 A.D.2d 229, 463 N.Y.S.2d 814 (N.Y.App.Div., 1983), *aff'd*, 61 N.Y.2d 976, 475 N.Y.S.2d 278, 463 N.E.2d 619 (N.Y. 1984), Singer also points to the well-established principle that typed language takes precedence over printed boilerplate, and that a document such as the letter agreement which was specifically prepared for this particular transaction takes precedence over general forms such as the stock, printed, security agreements used by FABNY in all of its lending transactions. *See, e.g., Teal v. Place*, 85 A.D.2d 788, 445 N.Y.S.2d 309 (Albany Co. App.Div.1981).

Both parties agree that New York law governs and that ambiguities in an agreement are to be resolved against the party who drafted the agreement. *See National Equipment Rental, Ltd. v. Reagin*, 338 F.2d 759 (2d Cir.1964) (applying New York law). Also, where there exist printed provisions which are inconsistent with prepared or negotiated provisions, the printed provisions must fail. *County of Wyoming, N.Y. v. Erie Lackawanna Ry. Co.*, 360 F.Supp. 1212, 1215 (W.D.N.Y.1973), *aff'd sub nom., County of Wyoming, N.Y. v. Insurance Company of North America*, 518 F.2d 23 (2d Cir.1975); *Poel v. Brunswick–Balke–Collender Co.*, 216 N.Y. 310, 322, 110 N.E. 619 (1915); *Kratzenstein v. Western Assurance Co.*, 116 N.Y. 54, 57, 22 N.E. 221, 5 L.R.A. 799 (1889).

It is apparent that notwithstanding the definition of collateral in the printed security agreement, the specific creation of an unsecured line of credit in the letter agreement coupled with the parties subsequent behavior clearly manifests an intent to create two separate and distinct lines of credit, at different rates of interest, and with different lending limit criteria; one secured for $4,000,000.00, the other unsecured for $1,000,000.00.

The March 11, 1986 letter agreement prepared by FABNY provides at paragraph 14 that funds under the "secured" line shall be loaned in an amount of "up to 75% of the aggregate value of documentary collections, not more than 60 days past due,

which have been presented for collection through the bank." FABNY's inter-office "loan history" documentation indicates that on March 14, 1986, $400,000.00 was advanced to Singer against the "unsecured" credit line, and that on March 20, 1986 an additional $600,000.00 was advanced against this same line. Assuming for the moment that this line were "secured", then, in order for Singer to borrow $1,000,-000 on this line, as of March 20, 1986, good, acceptable "documentary collections presented for payment through FABNY" of at least $1,333,334.00 would have had to exist. Yet as of that date there was only approximately $474,000.00 in documentary collections "dated by Singer", all of which appear to have been unknown to FABNY and its alleged agents. As of March 20, 1986, by FABNY's own calculations, it had received either directly or through its agent a total of *$0* documentary collections to be used to prime the "secured" line. Thus FABNY's actions contradict their position.

Moreover, FABNY's conduct prior to this litigation, evidenced by a plethora of FABNY's internal memoranda, furthers a finding that two lines were intended, and we so hold. *Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118, 33 S.Ct. 967, 972, 57 L.Ed. 1410 (1913) (Generally speaking, the interpretation given to a contract as manifested by the conduct of the parties for a considerable period of time before a controversy arises, is deemed of great, if not controlling, importance); *Ocean Transport Line Inc. v. American Philippine Fiber Industries, Inc.*, 743 F.2d 85, 91 (2d Cir. 1984); *Sanchez v. Maher*, 560 F.2d 1105, 1108 (2d Cir.1977); *Lubrication & Maintenance, Inc. v. Union Resources Company, Inc.*, 522 F.Supp. 1078, 1081 (S.D.N.Y.1981) ("determination of the intent of the parties at the time they entered into the contract is not governed by their unexpressed subjective views, but rather by what they wrote, their acts, conduct and all surrounding circumstances"); *Ottley v. Palm Tree Nursing Home*, 493 F.Supp. 910, 914 (S.D.N.Y. 1980); *Viacom International, Inc. v. Lorimar Productions, Inc.*, 486 F.Supp. 95, 98, n. 3 (S.D.N.Y.1980); *O'Neil Supply Co. v.*

*Petroleum Heat & Power Company*, 280 N.Y. 50, 55, 19 N.E.2d 676 (1939).

For example, annexed as Exhibit F is an internal memorandum of FABNY, dated 2/28/86, labelled a "call report" from Montano which sets forth Singer's preliminary evaluations with respect to a prospective letter of credit for $5 million, $4 million secured and $1 million unsecured, which was to be presented to FABNY's credit committee for evaluation and ultimate approval. Also annexed as Exhibit C are the minutes taken of FABNY's credit committee hearing held on March 7, 1986 which labels as proposal two a—"5MM (1), 4MM secured, 2) 1MM unsecured" letter of credit, with the rate to be charged on the secured facility at the reference rate, and the unsecured portion at reference plus ¼%. Also annexed to the same exhibit is an inter-office memo from Montano to Toccetta, another FABNY employee, which states—

> *[s]ubject has a 5MM line of which 1MM is unsecured.* The 4MM secured line must be collateralized by foreign receivables evidenced by documentary collections submitted through FABNY.... U.C.C. filings should already have been completed on these collections.... (emphasis added.)

One of the more important documents indicating FABNY's intent is an internal memo from C.J. Powers, Senior Vice–President of FABNY, to FABNY's credit committee, dated June 3, 1986, signed by and approved and signed by FABNY's creditor committee on June 5, 1986 which states—

> [t]he subject facility was approved in March, 1986 (copy of CR attached) to be secured ($4MM) *by receivables and inventory with UCC filings. FABNY's facility was to replace Chemical Bank's, hence the need for an inter-creditor agreement did not arise. The situation has not changed and Chemical has decided to remain in the credit; thus an agreement is essential.* (emphasis added).

It was only after FABNY was made aware of Singer's continuing financial deterioration that the necessity for the inter-creditor agreement with Chemical became that much more vital as recognized in an internal memo Montano sent to Ganoe on June 23, 1986, which states in relevant part—

> The attached memo unfortunately reports a deterioration in the financial condition of Singer Products. I have discussed the situation with Bill Powers, and with the Security Agreement and UCC filings in place, *Bill would like prompt discussion with Chemical Bank for the primary purpose of negotiating on an inter-creditor agreement.* (emphasis added).

It was only after failing to obtain this inter-creditor agreement with Chemical, and in order to reduce its risks should this financial slide continue, that FABNY altered its course of conduct and thereafter attempted to reduce its risk by apportioning the draw downs between the two lines at a rate of 75% secured, 25% unsecured. This too is evidenced by FABNY's internal memoranda. For example, a "Problem Loan Report", apparently belonging to FABNY, indicates that "Chemical, whose outstandings are approximately $3MM, has been approached regarding an inter-creditor agreement." Another document entitled a "Direct Contact Report", dated 8/1/86, indicates that a meeting was in fact had between FABNY and Singer for the purpose of updating Singer's financial status. On page two of this report was a discussion of a possible "switchover" of the unsecured letter of credit to the secured letter of credit and the effect this would have upon Singer's filing for bankruptcy:

> [f]urther to our request that our $750,-000 unsecured portion loan be retired or switched to the secured portion, Rothheim indicated that this was presently not possible due to liquidity problems and preferential treatment difficulties.

And finally, Singer points to a personal letter written by Powers, dated July 25, 1986, addressed to Richard Singer, Singer's Chief Executive Officer, which puts into perspective the history of their strained financial relationship:

[a]s we are now being informed that a significant loss was registered in 1985, we feel misrepresentations were made. . . . Accordingly, we will leave the secured portion of your loan in place. *The unsecured borrowing, however, must be retired or switched to the secured portion of the line through the provision of additional documentary collections or other collateral, as quickly as possible, with minimum monthly reductions of $150,000.* (emphasis added)

We therefore hold that two credit facilities exist, one secured, the other unsecured. Therefore, to the extent that FABNY applied security towards repayments under the "unsecured" line within 90 days of Singer's filing such draw downs are preferential. FABNY's contention that these transactions fall within one of the exceptions to preferential avoidability will be discussed *infra.*

Before we address whether FABNY is a collecting bank entitled to the protection of Article 4 or any other sections of the U.C.C., we can dispose of FABNY's claim of a security interest in, *inter alia*, merchandise, accounts, and inventory. Case law makes clear that "a security interest granted by a debtor to a creditor is limited strictly to the property or collateral described in the security agreement." *In re Schmaling,* 783 F.2d 680, 682 (7th Cir. 1986); *see United States v. Carolina Eastern Chemical Co.,* 638 F.Supp. 521, 524 (D.S.C.1986); Anderson, 8 *Treatise on the Uniform Commercial Code,* § 9–2–3:13 at 668 (3d ed. 1980). As the security agreement makes no mention of merchandise, inventory and or accounts, FABNY cannot claim perfection of a security interest in any of these pursuant to NYUCC Article 9.

## CREDITS TO THE SECURED LINE AS PREFERENCES

■ With regard to the "secured" line, Singer contends that all repayments thereunder must also be preferential under § 547 for the following reasons: FABNY filed its financing statements to perfect the security for the "secured line" not only more than ten days subsequent to its creation, but also within the 90 days prior to Singer's chapter 11 filing; that such filing within the 90 days constitutes a voidable "transfer" under § 547; that all other elements of § 547 have been proven; and accordingly, any and all repayments under this line within the 90–day period, less any payments which may have made pursuant to some recognized statutory exception, may be recovered by the debtor. *See Anderson v. Delong (In re Chicora Group),* 99 B.R. 715 (Bankr.D.S.C.1988).

While conceding this point with regard to such perfection as may have been obtained by the filing of a UCC financing statement, *see, e.g., In re Silve,* 86 B.R. 230 (Bankr.D. Mont.1988) (filing of a financing statement constitutes a "transfer" of the debtor's interest in property), FABNY argues that with regard to documentary collection items, it has a perfected security pursuant to NYUCC Article 4 which deals with collections of "items" (T., 7/27/88 at 4–5). FABNY claims that with regard to its security in "items" such as "drafts" in which it is the named payee, it has perfection by possession and a security interest superior to all others by virtue of NYUCC Articles 4 and 9; and further that "any person who comes into possession of the item is, as a matter of law, on notice that FABNY has an interest in that item and payment to anyone other than FABNY, absent a satisfaction of the restrictive endorsement by FABNY, would be fraudulent." (T., 7/27/88 at 5).

FABNY next asserts a fully perfected security interest in "items" in its possession under NYUCC §§ 9–203(1)(a), 9–305, 9–304(1), claiming that each item was in the possession of one of its agent, the overseas collecting bank and "[t]hat an interest in an instrument such as a documentary draft must be perfected by possession is black letter law." (FABNY's memo in support at 13.)

FABNY uses the terms "item" and "instrument" interchangeably. However, in § 3–102(1)(e) "instrument" means a negotiable instrument and in § 4–104(1)(g) "items" includes instruments which need

not necessarily be negotiable. Furthermore, the "Practice Commentary" to McKinney's NYUCC § 4–208 reinforces this distinction by stating: "[i]t should constantly be borne in mind, however, that due course holding under U.C.C. art. 3 applies to negotiable instruments; and does not apply to 'items' under this article (U.C.C. § 4–104(1)(g)) that are not negotiable instruments." The indiscriminate interchangeability of these terms by FABNY therefore leads one to question the logical consistency of its argument.

However, whether we analyze the transaction as one of items or one of instruments, although the analysis leads us through different sections of the NYUCC, the result is identical. FABNY insists upon perfection by virtue of possession via the overseas banks which it claims to be its agent. Chemical and Singer both maintain that FABNY's claim to a security interest in documentary drafts in the possession either of it or in the possession of its claimed agents is insufficient since 1) the documentary drafts were never possessed by FABNY; 2) it was Singer who completed and delivered the drafts to the foreign banks; 3) the overseas banks were not FABNY's agent and 4) most, if not all, of these international transactions involved immediate cash payments.

To resolve this dispute, we must determine the extent, if any, to which Article 9 of the NYUCC is applicable. Section 9–102(1)(a) provides in pertinent part that this Article is applicable—"to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, accounts or contract rights." Chemical argues a security interest in accounts and inventory, while FABNY argues one in instruments; both of which are covered by Article 9.

No one questions that to successfully maintain a security interest in instruments, possession is an indispensable element, with certain exceptions not relevant herein. NYUCC § 9–304(1). FABNY argues, pursuant to NYUCC § 9–305, that it has possession via the collecting banks overseas which it claims as its agents, and that such possession perfects its interest so long as one of the agents maintains possession of the collateral.

NYUCC § 9–305 provides—

A security interest in letters of credit and advice of credit, ... goods, instruments, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral. If such collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the served party's interest. A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained. . . .

"Possession" is not defined in the Code. *See Maloney v. Stewart Title & Trust of Tuscon (In re Nichols)*, 88 B.R. 871, 875 (Bankr.C.D.Ill.1988).

Sections 9–304(1) and 9–305 of the NYUCC make it clear that possession of the collateral may be by that of an agent acting on behalf of the secured party, provided that 1) the agent is not controlled by the debtor, and 2) possession is such as to prevent the debtor from having control of or access to the collateral. *In re Copeland*, 531 F.2d 1195, 1204 (3d Cir.1976); *Clarkson Co. Ltd. v. Shaheen*, 533 F.Supp. 905, 912 (S.D.N.Y.1982). Thus, even assuming, contrary to the facts herein, that FABNY had been in possession of the collateral by virtue of its agent's possession, to the extent that Singer had control or access to the collateral, the security interest would have been destroyed.

Official comment 6 to 9–205 points out that it is *not* the case that

the holder of an unfiled security interest, whose perfection depends on possession of the collateral by the secured party or by a bailee ... can allow the debtor access to and control over the goods *without thereby losing his perfecting* status. The common law rules on the degree and extent of possession which

are necessary to perfect a pledge instrument ... are not relaxed by this or any other section of this article. (emphasis added);

see also, *Clarkson Co. Ltd.*, 533 F.Supp. 905 at 918.

Thus, it is clear that "unless a putative secured party's possession of pledged instruments rises to the level of 'actual and exclusive possession' as required at common law, his security interest has not been perfected. The pledgor must surrender his dominion over the property, and any and all semblance of ostensible ownership must be negated." 4B Collier, *Bankruptcy*, ¶ 70.86 at 982 (14th ed. 1978).

This circuit has recognized and reaffirmed these requirements. *See, e.g., Gins v. Mauser Plumbing Supply Co., Inc.*, 148 F.2d 974 (2d Cir.1945); *Sammet v. Mayer*, 108 F.2d 337 (2d Cir.1939); *Degener v. Boyd (In re Merz)*, 37 F.2d 1 (2d Cir.), cert. denied, 281 U.S. 738, 50 S.Ct. 333, 74 L.Ed. 1152 (1930); *Clarkson Co. Ltd., supra; Hassett v. Blue Cross and Blue Shield of Greater New York (In re O.P.M. Leasing Services, Inc.)*, 46 B.R. 661, 670 (Bankr.S.D.N.Y.1985). The rationale for this rule is really quite simple—"the debtor's lack of possession coupled with actual possession by the creditor, the creditor's agent or the bailee serves to provide notice to prospective third party creditors that the debtor no longer has unfettered use of [its] collateral," *Ingersoll–Rand Financial Corp. v. Nunley*, 671 F.2d 842, 844–45 (4th Cir.1982), citing *Heinicke Instruments Co. v. Republic Corp.*, 543 F.2d 700, 702 (9th Cir.1976), and that the property can no longer be repledged for further financing. *Norwest Bank St. Paul, N.A. v. Bergquist (In re Rolain)*, 823 F.2d 198 (8th Cir.1987); *In re O.P.M. Leasing Services, Inc.*, 46 B.R. 661 at 670; see J. White and R. Summer, *Handbook in the Law Under the Uniform Commercial Code*, § 23–10 at 814 (1972).

All of the parties concur that it was Singer who filled out the documentary collection form, forwarded to the foreign overseas bank the draft and accompanying documents, and that Singer thereafter sent copies of the non-negotiable bill of exchange to FABNY for its files. Unless specifically requested by Singer, FABNY had no input in choosing who would be the foreign overseas collecting bank. FABNY therefore could not have given explicit notice of its interest in the drafts. (See NYUCC § 9–305 and the official comments thereto which requires notification of the secured party's interest.) FABNY argues that being named as the payee, this, in and of itself, constituted such notification, and any payment other than as directed by the face of the draft was prohibited by Article 14 of International Chamber of Commerce Publication 322, discussed *infra*. (FABNY memo of law in support at 17). FABNY, however, contradicts this reasoning by conceding that although payment other than as required by the draft was prohibited, Singer directly received in excess of $300,-000.00 as *proceeds* of the documentary collection items, although Singer voluntarily remitted these to FABNY.

What is even more troubling is that when $150,568.98, "representing documentary collection item *proceeds* [was] received by Singer instead of FABNY," (FABNY Summary Judgment motion, Local Rule 22(b) statement at page 6, paragraph 12) Singer, it appears, deposited the check in its FABNY account and then drew a check to transfer these funds to FABNY. (FABNY's memo of law in response at 16). The extent both of FABNY's lack of dominion over these funds and of Singer's control over them is demonstrated by the fact that when FABNY received Singer's check, it inquired of Singer what should be done with the proceeds. It was pursuant to Singer's instructions rather than FABNY's decision, as FABNY alleges, that FABNY applied this sum in payment against Singer's $1 million line. If it is true, as FABNY argues, that payment could only be made as described in the draft, then Singer should not have received in excess of $150,-000.00 of proceeds of such collateral and should not have been able to control its use and application as described above. Singer, had it chosen to, could have used these proceeds as collateral to be pledged for a further loan, without such institution ever

realizing that these funds represented, as FABNY claims, its collateral. FABNY notes in its memorandum of law that "[S]inger [also] received a few *payments* of documentary collection items *proceeds* directly from overseas collecting banks.", *id.*, (emphasis added), and that "Singer also received *payments* of documentary collection item proceeds *directly* from overseas collecting banks, *including one collection for $154,718.61.*" (FABNY memorandum of law in support of Summary Judgment at 10). (emphasis added).

All told, FABNY concedes that Singer directly received from the overseas banks unrestricted proceeds of FABNY's collateral totalling conservatively $305,000.00. Singer thus had unfettered control over these funds and could do as it pleased with them. Pursuant to *Copeland, Rolain, Shaheen, Ingersol–Rand Financial Corp.,* and *O.P.M. Leasing Services, Inc., supra,* even were the overseas banks to be considered the agents of FABNY, such relinquishment to Singer of complete access and control over these proceeds of what FABNY claims to be its collateral, destroyed FABNY's perfection by possession notwithstanding Singer's subsequent payment to FABNY.

■ FABNY's claim that the overseas collecting banks served as its agent also fails to hold up. In support of its position that the overseas collecting banks served as its agent, FABNY submitted a leaflet to this court entitled "Uniform Rules for Collection, Publication 322," ("Publication 322") which Singer acknowledges governs international collections but not security interests (Debtor's reply memorandum at 4). Chemical makes no mention of this document. Annexed to FABNY's summary judgment motion as Exhibit d, is a blank documentary collection form/item utilized by Singer in the collection process which indicates in bold black letters that "unless otherwise specified, this collection is subject to the Uniform Rules for Collection (ICC Publication # 322)"

Briefly, FABNY alleges that Part C of this document makes plain that overseas collecting banks are strictly limited to the instructions stated on the documentary collection item. Since FABNY is the named payee on each item, and since the overseas collecting banks sent FABNY acknowledgements of receipt of the drafts and accompanying documents, FABNY claims that this action manifests their intent to act exclusively as FABNY's agent.

The argument falls with its premise. Under Part B of Publication 322, entitled "General Provisions and Definitions", "principal" is defined as "the customer entrusting the operation of collection to his bank"; "remitting bank" defined as "the bank to which the principal has entrusted the operation of collection"; and the "collecting bank" is defined as "any bank, other than the remitting bank, involved in processing the collection." As applied in this case the "principal" is Singer, the "remitting bank" is FABNY, and the "collecting bank" is the foreign overseas bank.

Publication 322 thus makes clear that the overseas collecting bank is subject to the control of the principal, Singer. Article 3 states in part—"[f]or the purposes of giving effect to the instructions of the principal, the remitting bank *will* utilise (French version) as collecting bank—the collecting bank nominated by the principal ..." and "[b]anks utilizing the services of other banks for the purpose of giving effect to the instructions of the principal do so for the account of and at the risk of the latter." To the extent a collecting bank uses another bank in aid of collection on consent of the principal, it is Singer, and not FABNY, who bears all risks should something run afoul in the transaction. This also indicates that it was Singer rather than FABNY who was the principal.

Article 4 of Publication 322, subsection (b), states *"banks* concerned with the collection assume no liability or responsibility for the consequences arising...." This, too, makes clear, by the term *"banks"*, as including the remitting, collecting and presenting banks, that the onus of risk falls on Singer, and not FABNY as FABNY is the remitting bank. In sum, this document, although supplied by FABNY,

contradicts, rather than supports, its position.

 FABNY has further failed to establish its claim of a principal/agency relationship with the overseas collecting banks. It is settled law that the party claiming agency status has the burden of proving it and that self-serving statements to this effect are insufficient. *Tarstar Shipping Co. v. Century Shipline, Ltd.*, 451 F.Supp. 317, 323 (S.D.N.Y.1978), *aff'd*, 597 F.2d 837 (2d Cir.1979); *La Societe Nationale Pour La Recherche, La Production, Le Transport, La Transformation et al Commercialisation Des Hydrocarbures v. Shaheen Natural Resources Company, Inc.*, 585 F.Supp. 57, 62 (S.D.N.Y.1983), *aff'd per curiam*, 733 F.2d 260 (2d Cir.), *cert. denied*, 469 U.S. 883, 105 S.Ct. 251, 83 L.Ed.2d 188 (1984); *see generally*, 2 S. Williston, A Treatise on the Law of Contracts, § 295 at 374 (3d ed. 1959). The creation of an agency relationship is initiated by the principal, not by the agent. Evidence of the acts and the intent of the principal is therefore an essential element in order to establish the existence of the agency relationship. Objective extrinsic evidence must be shown; subjective statements will not suffice. The court must sift through all the facts and circumstances to make the ultimate determination whether an agency has been created and who shall be classified as an "agent." *S.E.C. v. American Board of Trade, Inc.*, 654 F.Supp. 361, 366 (S.D.N.Y.), *aff'd in part, dismissed in part*, (2d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1118, 99 L.Ed.2d 278 (1988). And, "where the public interest or the rights of third parties are involved [as in this case], the relationship ... must be determined by its real character rather than by the form and color that the parties have given it." *Pan American World Airways, Inc. v. Shulman Transport Enterprises, Inc. (In re Shulman Transport Enterprises, Inc.)*, 744 F.2d 293, 295 (2d Cir.1984), *citing, Quackenbos v. Sayer*, 62 N.Y. 344, 346 (1875). This is of even greater significance where the rights of the bankrupt's creditors are in jeopardy. *Pepper v. Litton*, 308 U.S. 295, 304–05, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939).

 Agency is a contractual, consensual relationship, *Boss v. International Brotherhood of Boilermakers, Inc.*, 567 F.Supp. 845, 847, n. 1 (S.D.N.Y.), *aff'd w'out decision*, 742 F.2d 1446 (2d Cir.1983), consisting of three elements—1) a manifestation by the principal that the agent shall act for him; 2) the consent of the agent; and 3) an understanding that the principal is to be in control of the undertaking. *Shulman Transport Enterprises Inc.*, 744 F.2d 293 at 295; *S.E.C. v. American Board of Trade*, 654 F.Supp. 361 at 366; *Ahn v. Rooney Pace Inc.*, 624 F.Supp. 368, 370 (S.D.N.Y.1985). The element most essential to the demonstration of any agency relationship is that of "control." H.G. Reuschlein and W.A. Gregory, *Agency and Partnership* 11 (1979).

FABNY repeatedly contends that the permanent instructions on the documentary collection items create the agency-relationship between it and the overseas bank, and that the overseas bank consented to the agency by accepting the items for collection and by sending an acknowledgment. (FABNY, Summary Judgement memo in support, pages 14–19 and FABNY's reply memo in response to Chemical and Singer's summary judgment motion pages 12–16). Annexed to the FABNY's summary judgment motion at Exhibit F appear the documents to be "acknowledged" by the overseas bank and sent back to FABNY. For instance, there appears a "cover letter" addressed to "Banco De Credito Del Peru" indicating who the drawee is (Singer's buyer) and on what terms the title documents evidencing ownership of the goods shipped by Singer may be given to the drawee. Also annexed is a form letter from FABNY, dated 5/5/86, to the drawee or the overseas collecting bank, which serves as a "tracer" informing the drawee that payment on an accepted draft is past due. And finally, there appears what seems to be the "acknowledgement" from the overseas bank, Banco De Credito Del Peru, dated 3/27/86, which FABNY contends establishes the element of consent prerequisite to this principal/agency relationship. The pertinent pre-printed language, un-

signed by any representative of the overseas bank reads:

GENTLEMEN:

We acknowledge receipt of the above described item which is being handled by us on collection basis under the terms mentioned hereon.

Please also see general instructions on reverse.

Very truly yours,

While this document indicates that the overseas bank acknowledged receipt of the "item" (draft) and accompanying documents, it does not, as FABNY contends, constitute either an "acknowledgement" or manifestation of consent by the overseas banks to enter into an agency relationship with FABNY.

There are also other factors mandating a finding that no such agency-relationship exists. No provision is set forth in the documentary collection form or accompanying draft which outlines the agency relationship or otherwise indicates that the risk of loss for nonpayment or damages to goods was consistent with FABNY's position and which, were it the principal, would fall on them. *See, e.g., Boss,* 567 F.Supp. 847 at 849, n. 1. Indeed, FABNY's supporting document, publication 322, seems to indicate that this risk is upon Singer. *See, e.g., Tarolli Lumber Co., Inc. v. Andreassi,* 59 A.D.2d 1011, 399 N.Y.S.2d 739, 740 (Onondaga Co.App.Div., 1977). Nor has FABNY submitted any documentation whatsoever either *signed or acknowledged* either by Singer or by any overseas bank manifesting their consent to serve as agent of FABNY. FABNY had no say in selecting the overseas collecting bank(s). FABNY, aside from procedures such as "tracing" payments, had no direct communication whatsoever with any of the foreign banks. (T., Cortes 7/9/87 at 28). Nor did FABNY possess any "control" over those banks claimed to be its agents. The documentary collection form and Publication 322 indicate that the overseas collecting banks are to take instructions from the principal, determined to be Singer.

More convincing of a lack of control, however, is the fact that although the permanent instructions on the documentary collection item authorized the overseas bank to endorse documents on its behalf, collect and remit payment to FABNY, over *$305,000.00* in *proceeds* of these items were sent directly to Singer.

In sum, FABNY has failed to sustain its burden of proving possession via a principal/agency relationship, and we so hold.

### NYUCC ARTICLE 4

FABNY next contends that if we conclude that FABNY is not protected under Article 9, then its security interest is protected under NYUCC Article 4, by § 4–208. In support, FABNY claims that as a collecting bank which has made an advance on or against an item or items, NYUCC §§ 4–208(1)(c), 4–208(1)(a) and 4–104(1)(g) provides it with a security interest in such item and accompanying document or proceeds, to the extent of the advance until "final settlement" of the item, NYUCC § 4–208(3), so long as the bank does not relinquish *possession* of the item or accompanying document for purposes other than collection. Official comment 1 to § 4–208 explains this by stating:

"[a] collecting agent may properly make advances on the security of paper held by him for collection, and when he does, acquires at common law a possessory lien for his advances. To the extent of its security interest, it is a holder for value, ... [*see* NYUCC §§ 303, 4–209], and is a holder, in due course, if it satisfies the other requirements for that status." (see NYUCC § 3–302).

This common law lien has been referred to as a "banker's lien."

Chemical and Singer argue that Article 4 does not apply, but even if it did, FABNY has not established that it is a collecting bank entitled to a § 4–208 lien. Both Chemical and Singer point out that FABNY did not possess the collateral since the overseas banks were not FABNY's agent for purposes of possession. Further, Chemical points to FABNY's internal memorandum which conditions approval of Singer's financing upon FABNY's obtaining an inter-creditor agreement with Chemical su-

bordinating its position to that of FABNY. *See Robinson v. Howard Bank (In re Kors)*, 819 F.2d 19, 24 (2d Cir.1987); *see generally, In re Credit Industrial Corp.*, 366 F.2d 402, 408–10 (2d Cir.1966). This, Chemical asserts, belies FABNY's contention that the security consisted of anything other than Singer's accounts receivables and inventory and establishes FABNY's acknowledgement that it never intended to become a collecting bank. If it had been a collecting bank, its priority would have been established by operation of law and there would be no necessity for a subordination agreement.

In evaluating the argument of Chemical and Singer that only Article 9, and not Article 4 is applicable, one need only look to the specific language of NYUCC § 9–102(1) which states in relevant part— "... [t]his Article applies so far as concerns any personal property and fixtures *within the jurisdiction of this state....* (emphasis added) Although the court may still retain jurisdiction over the parties to this proceeding, when the goods were shipped overseas they were no longer "within the jurisdiction of this State", thereby making Article 9 inapplicable.

Chemical argues that although FABNY may have had a security interest in "items", it did not in fact receive "items" from the overseas banks. What it did receive were wire transfers representing proceeds of items. Since "wire transfers" are not "items", upon the conversion of the "item" into a "wire transfer" FABNY lost its security interest.

■ It is unclear whether a "wire transfer" is an "item" taken for collection under Article 4. *See; e.g., J. White & R. Summers*, Uniform Commercial Code 646 (2d Ed.1980). Judge Gagliardi, in *Houston Contracting Co. v. Chase Manhattan Bank, N.A.*, 539 F.Supp. 247, 249, n. 2 (S.D.N.Y.1982) addressed the issue of whether a "telexed transfer" was a "demand item", concluding it to be an item by embracing a non-restrictive interpretation of "item" which encompasses unsigned telexes. Courts in other districts have also applied Article 4 principles in assessing the relationship between the initiator of a wire transfer and the correspondent bank which, in effect takes the transfer for collection. *See, e.g., Securities Fund Services, Inc. v. American National Bank & Trust of Chicago*, 542 F.Supp. 323, 326–27 (N.D.Ill. 1982). (Article 4 covers items issued to payees for collection, as where corporation transfers balances from one account to another). The district court for the Southern District of New York (Sofaer, J.) in *Bernstein v. Alpha Associates, Inc. (In re Frigitemp Corp.)*, 34 B.R. 1000, 1022, n. 5 (S.D.N.Y.1983), *aff'd*, 753 F.2d 230 (2d Cir. 1984), equated an advance on a wire transfer as part of its collection process with that of an advance on a check taken for collection under Article 4 principles, finding a wire transfer to be the equivalent of an item for Article 4 purposes. We, too, agree with the broader, nonrestrictive definition of "item" as set forth in *Houston Contracting Co.; accord, In re Standard Financial Management Corp.*, 94 B.R. 231, 234 (Bankr.D.Mass.1988), and concur with the holding that a wire transfer is sufficiently similar to that of a check to make it an "item" for purposes of Article 4.

■ Turning to the primary issue, official Comment 1 to § 9–102 makes it clear that a security interest arising by statute or common law, such as a banker's lien, is not governed by Article 9. Accordingly, to the extent FABNY fulfilled the other elements of NYUCC §§ 4–105(d) (collecting bank status) and 4–208, we could find that FABNY had a "banker's lien" to the extent of any advances made on or against these wire transfers.

NYUCC § 4–105(d) defines a collecting bank as any bank holding an item for collection except a payor bank. Although no one seriously disputes that the drafts in question are "items", FABNY falls short of the definition of a "collecting bank."

FABNY claims status as a collecting bank based upon its alleged ownership of, or security interest in, documentary drafts drawn by Singer on various overseas buyers and endorsed over to FABNY as the named payee. Singer is the drawer who ordered the drawee/payor (its customer

overseas) to pay FABNY, the payee, for goods purchased. The overseas collecting banks on each item were the "depository banks", since they were the first bank to which the original bills of exchange were sent or transferred for collection by the drawer. UCC § 4–105(a). The overseas banks were also both the "presenting bank" and the "collecting bank"; they were "presenting banks" because they presented the "drafts" or "bills of exchange" to Singer's customers for acceptance and payment, *see* NYUCC § 4–105(e) and they were the "collecting banks" because they handled the items for collection and were not payor banks. NYUCC § 4–105(d). *See generally, Union Bank of Benton v. First National Bank*, 621 F.2d 790 (5th Cir.1980) (general discussion of the characterization of the parties to a similar transaction.)

In order to succeed, FABNY must convince us that it was a collecting bank "handling the item for collection, but not a payor bank."

Taking a step back for the moment, we are, although not premising our conclusion on this argument, unsure whether the definitions set forth in § 4–105 are applicable to FABNY at all. Comment (1) to this section reads:

> [t]he definitions in general exclude a bank to which an item is issued, as such bank does not take by transfer except in the particular case covered where the item is issued to a payee for collection, as where a corporation is transferring balances from one account to another. Thus the definition of 'depository bank' does not include the bank to which a check is made payable where a check is given in payment of a mortgage. Such a bank has the status of a payee under Article 3 on Commercial Paper and not that of a collecting bank.

This would seem to indicate that the terms "payee" and "collecting bank" are mutually exclusive. To the extent that this is so, FABNY is not entitled to the protection of 4–208 as a collecting bank since it is the named payee. Nevertheless, since no party has raised this issue, we shall proceed, just for the moment, as if Article 4 were applicable, in order to determine whether FABNY has attained the status of a collecting bank.

Section 4–105(d) of the UCC sets out a very practical common sense definition of "collecting bank" as "any bank *handling* the item for collection except the payor bank." (emphasis added). *See also, Southern Cotton Oil Co. v. Merchants Nat. Bank*, 670 F.2d 548 (5th Cir.1982); *Union Bank of Benton v. First Nat. Bank, supra; Northpark National Bank v. Bankers Trust Co.*, 572 F.Supp. 524 (S.D.N.Y.1983); *Wilhelm Foods v. Nat. Bank of North America*, 382 F.Supp. 605 (S.D.N.Y.1974). The parties dispute whether FABNY handled the items. Chemical argues that FABNY could not have "handled" the items, as it was never in possession of the items, the original documents of title, the original bills of lading, the original invoices or the original bills of exchange. Chemical thus implies that "possession" is prerequisite to "handle." (Chemical's Memorandum in Support of Summary Judgment at 23).

Section 4–208(1)(c) provides a collecting bank with a security interest in an item, its documents and proceeds thereof to the extent an advance is made on or against the item. Section 4–208(3) makes clear that the security interest continues for so long as the bank does not receive final settlement so long as it has not given up possession of the item except for purposes of collection. Reading these two sections together, it seems reasonable to conclude that to achieve § 4–208 status, the bank must show that it "possessed and handled" the item and made an "advance on or against" the item.

Neither Chemical nor Singer specifically address the extent to which FABNY "made advances on or against the item." Supporting its 4–208 status, FABNY cites to *Goggin v. Bank of American National Trust & Savings Assn.*, 183 F.2d 322 (9th Cir.), *cert. denied*, 340 U.S. 877, 71 S.Ct. 122, 95 L.Ed. 637 (1950) for the general proposition that a bank has a lien in any securities in its possession to the extent a

bank has advanced funds against them. FABNY claims that since it lent monies against these items, it is entitled to a § 4–208 lien. As Chemical correctly points out *Goggin* has its foundation under Section 3054 of the California Civil Code, and even if such section were sufficiently similar to the NYUCC § 4–208 to draw a good analogy, *Goggin* indicates that the banker's lien is only valid to the extent that such property is in the *possession* of the bank. FABNY, however, was never in possession of the item.

Nor are we persuaded by FABNY's citation to *Bowling Green, Inc. v. State Street Bank & Trust Co.*, 425 F.2d 81 (1st Cir. 1970) in further support of its § 4–208 lien. In *Bowling Green, Inc.*, State Street Bank & Trust Co. ("State") took a check from its depositor-debtor, Bowl–Mor, given to it from Bowling Green, Inc. ("Green"), in a conditional sales contract had between Bowl–Mor and Green. Bowl–Mor deposited the check with State, which immediately credited a portion of the check against an overdraft in Bowl–Mor's checking account. On the same day, after hearing that Bowl–Mor filed a Chapter X petition in bankruptcy, State applied the balance of the check, less approximately $200, to the remainder of an indebtedness Bowl–Mor owed State. Green sued, seeking to recover the payment from State, on the grounds that State took the funds in trust. The District Court disagreed, concluding instead that State was a holder in due course under Mass. Gen.Laws c. 106, §§ 4–209 and 3–302, taking the item free of all personal defenses. On appeal Green argued, *inter alia*, that State had not given value under § 4–209 for the set off against Bowl–Mor's loan account. The Circuit Court, first noting that Article 4 applies to "establishing a compliance scheme for simplifying and expediting bank collections", affirmed the decision of the District Court. In affirming, it necessarily concluded that State was a "holder in due course" ("HIDC") of the check. In order to be a HIDC, one must first be a "holder" which means that the party must be in *possession* of the documents of title or an instrument. *See* Mass.Gen.Law Ann. c. 106, § 1–201(20);

NYUCC § 1–201(20). The Circuit Court found, *inter alia*, that State was a "holder as it was in possession of the check, taking such check from a customer who himself was a holder." *Bowling Green, Inc.*, 425 F.2d 81 at 84. FABNY, on the other hand, does not meet the "possession" test of a holder.

FABNY never gave up possession for purposes of collection since it was never in possession of the items. Although the Circuit Court never expressly addressed State's possession of the check in affirming, it necessarily must have found the bank to be in possession of the check. The real issue on appeal was rather whether State's crediting of Bowl–Mor's outstanding indebtedness constitutes an "advance against an item." Since any support FABNY seeks in *Bowling Green* is nothing more than "dicta" we afford it no persuasive weight. Other cases cited by FABNY in support, *Holsonback v. First State Bank of Albertville*, 394 So.2d 381 (Ala. Civ.App.1980), *cert. denied, Ex Parte Holsonback*, 394 So.2d 384 (Ala.1981); *Schnitger v. Backus*, 10 Wash.App. 754, 519 P.2d 1315 (1974); *Schwab v. Walden Savings Bank*, 109 Misc.2d 929, 441 N.Y.S.2d 195 (Orange Co.Sup.Ct., 1981), also make clear that a § 4–208 lien is premised upon *both* possession by the bank and an advance against the item in possession at the time of the advance, or out of possession for collection purposes only. FABNY was never in such possession.

The legislative history underlying § 4–208 also supports our conclusion that Article 4, particularly § 4–208, is not applicable to a Bank in FABNY's position. Section 4–208's origin and principle goes back to the late 1700's when Lord Kenyon in *Davis v. Bowsher*, 5 T.R. 488, 492, 101 Eng.Rep. 275, 277 (1794) in discussing the banker's lien stated:

A banker has a general lien upon all the securities on his hands belonging to any particular person for his general balance, unless there be evidence to shew [sic] that he received any particular circumstances, which would take it out of the common rule * * * Wherever a banker

has advanced money to another, he has a lien on all the paper securities which come into his hands for the amount of his general balance. * * * No person can take any paper securities out of the hands of his banker, without paying him his general balance, unless such securities were delivered under a particular agreement which entitles him to do so.

After the *Davis* case, Lord Ellenborough in *Giles v. Perkins*, 9 East 12, 14 (1807) declared that when paper was left with a banker for collection, he became an agent, but, if the banker discounts the bill or advance money upon the credit of it, that alters the case; he then acquires the entire property of it, or has a lien on it *pro tanto* for his services. *See also, Lowrance Motor Co. v. First Nat'l Bank*, 238 F.2d 625 (5th Cir.1956).

This common law pronouncement was codified in the Negotiable Instruments Law. *See, e.g.,* NYNIL § 350-a (predecessor to NYUCC § 4-208); *The Bath National Bank v. Sonnenstrahl*, 249 N.Y. 391, 164 N.E. 327 (1928), *rev'g,* 224 A.D. 694, 228 N.Y.S. 750; *Florida Citrus Exchange v. Union Trust Company of Rochester*, 244 A.D. 68, 278 N.Y.S. 313 (1935); *Meadow Brook National Bank of Nassau County v. Paramount Factors, Inc.*, 8 Misc.2d 362, 167 N.Y.S.2d 468 (Nassau Co.Sup.Ct., 1957). The New York annotation to NYUCC § 4-101 also makes clear that Article 4 restates certain portions of the N.I.L.—("Article 4 dealing with bank deposits and collections, will replace Article 19-A of the N.I.L. [Bank Collection Code of the American Banker's Association, except for N.I.L. § 350-b, . . .], and certain of the provisions of the N.I.L. as they may have been applied to this subject matter"). NYUCC §§ 4-101 and 4-208 also indicate that the parties legal relationships, as would have existed under the NYNIL upon the facts *sub judice*, continue unchanged under the Uniform Commercial Code. For example, *Universal C.I.T. Credit Corp. v. Guaranty Bank & Trust Co.*, 161 F.Supp. 790 (D.Mass.1958), cited under the "Notes of Decisions" subsection of NYUCC § 4-208, discusses the interaction of Sections 4-208 and 4-209 under the UCC, al-

though that decision was rendered prior to the effective date of the UCC. Therefore, when a customer is allowed to draw against a check deposited but not yet collected, that withdrawal gives rise to a lien against the check in favor of the depository bank equal to the amount of the advance.

The rationale of the banker's lien and the necessity of its adoption by the UCC is obvious. If banks were not given the protection of the banker's lien they would not permit their customers to utilize uncollected funds; and the amount of uncollected funds now in existence would be removed from the nation's money supply. The magnitude of these uncollected funds is staggering. *North Park Nat. Bank*, 572 F.Supp. 524 at 526; *see* 68 Annual Report, Board of Gov. of the Fed.Res.Syst. 233, table 9 (1981) (more than 16 billion handled in 1981); NYUCC § 4-101, Official comment ("Individual Federal Reserve banks process as many as 1,000,000 items a day; large metropolitan banks average 300,000 a day; banks with less than $5,000,000 on deposit handle from 1,000 to 7,000 daily".) This flow of funds constitutes the arterial system through which business pours its output into America's capitalistic mainstream. The banker's lien preserved in Article 4 serves as an inducement to the banks to continue to provide this source of money. *Dziurak v. Chase Manhattan Bank N.A.*, 88 Misc.2d 641, 388 N.Y.S.2d 496, 501 (Kings Co.Sup.Ct.1976), *rev'd on other grounds*, 58 A.D.2d 103, 396 N.Y.S.2d 414 (Kings Co.App.Div., 1977). Allowing the depository bank in possession of the check or item a common law possessory lien in the check to the extent credit has been given on that item ensures that the bank will realize on its security interest in the item in its possession and induces the bank to generate an increased money supply.

There exists another reason to afford super priority status to the collecting bank making advances against the item. But for the original transaction by which the § 4-208 lien generates, no other party to this transaction would have any property to which its security interest could attach.

FABNY, however, has failed to sustain its burden of proving that it is a collecting bank. It was not in possession of any of the items in question; thus it could never have given up possession for purposes of collection; it therefore could never have "handled" the items. And the overseas collecting banks, as previously indicated, were not FABNY's agent for purposes of collection. Although it may have lent on the strength of these items, this, in and of itself, does not entitle it to the status of a collecting bank.

For this reason, any and all repayments by FABNY under its "secured line" within 90 days of Singer's filing are voidable as preferential. FABNY, however, avers that even if its security interest is not protected under NYUCC Article 4 or Article 9, the collection and application of the items to its outstanding loan balances constitutes an exception to preference avoidability. § 547(c).

### PREFERENCE EXCEPTIONS

■ Section 547(c) provides in relevant part:

(c) The trustee may not avoid under this section a transfer

(2) to the extent such transfer was—

a) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

b) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

c) made according to ordinary business terms.

This section is "intended to protect recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee", 4 L. King, Collier on Bankruptcy, ¶ 547–20 at 547–45 (15th ed. 1988) and leave intact undisturbed normal financial operations.

Singer has conceded and Chemical does not argue that the underlying debt was "incurred in the ordinary course of business or financial affairs of both parties." The test of § 547(c)(2)(a) is thus uncontest-ed. What is contested, however, is whether the repayments were made "in the ordinary course of business of both parties" and on "ordinary business terms."

Under § 547(g), the party claiming nonavoidability has the burden of proving the defenses set forth in § 547(c). Remes v. ASC Meat Imports Ltd. (In re Morren Meat and Poultry Company, Inc.), 92 B.R. 737, 740 (W.D.Mich.1988); Xtra Incorporated v. Seawinds, Ltd. (In re Seawinds, Ltd.), 91 B.R. 88 (N.D.Cal.1988); Richardson v. Philadelphia Housing Authority (In re Richardson), 94 B.R. 56, 59 (Bankr.E.D.Pa.1988); In re Ullman, 80 B.R. 101, 102 (Bankr.S.D.Ohio 1987).

Unfortunately, the phrases "ordinary course of business or financial affairs" and "according to ordinary terms" were not the subject of significant legislative history, nor are they specifically defined by the Code. See Waldschmidt v. Ranier (In re Fulghum Construction Corp.), 872 F.2d 739, 743 (6th Cir.1989); WJM, Inc. v. Mass. Dept. of Public Welfare, 840 F.2d 996, 1010 (1st Cir.1988). The legislative history's sparse mention of subsection (c)(2) provides—

[t]he purpose of this exception is to leave undisturbed normal financial operations, because it does not detract from the general policy of the preference section to discourage unusual action by either debtor or his creditors during the debtor's slide into bankruptcy.

H.R. No. 595, 95th Cong., 1st Sess. 373 (1977), S.R. No. 989, 95th Cong.2d Sess. 88 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5874, 6329.

The drafters of the code left the development of the test of "ordinariness" under § 547(c)(2) to the courts. See 5 Collier on Bankruptcy, ¶ 547.10, 547–46 (15th ed. 1988). Taken together, subsections (b) and (c) look to whether the transfer was in the ordinary course of business, while (b) standing alone, looks to the "subjective" course of dealings between the parties, and (c), to the "objective" "normal" course of business of similarly situated entities. Richardson, 94 B.R. 56 at 59; In re Steel

*Improvement Co.,* 79 B.R. 681 (Bankr.E.D. Mich.1987); *cf. Marathon Oil Company v. Flatau (In re Craig Oil Company),* 785 F.2d 1563, 1566 (11th Cir.1986) ("conceptually, it is difficult to disentangle these legal propositions, and the facts which go to prove these separate statutory sections.")

*Remes* maintains that under § 547(b) one does not look only to the prior course of dealings between the parties for its determination, but to industry custom and standards as well. *Fulghum* disagrees with *Remes,* holding that the appropriate focus is only upon the parties prior course of dealings. ("[t]he focus of this court's inquiry must be directed to an analysis of the business practices which were unique to particular parties under consideration and not to the practices which generally prevailed in the industries of the parties.") *Accord, WJM, Inc.,* 840 F.2d 996 at 1011 ("the cornerstone of this element of the preference defense is that the creditor needs demonstrate some consistency with other business transactions *between the debtor and the creditor.*") (quoting, *In re Magic Circle Energy Corp.,* 64 B.R. 269, 273 (Bankr.W.D.Okla.1986) (emphasis added). In any event, whether our inquiry focus upon the course of dealings between the parties or that of similarly situated parties within the industry, or both, we conclude that FABNY has failed to sustain its burden under § 547(c)(2).

The cases interpreting this section frequently use words such as "ordinary", "recurring", "customary", "normal", "consistent", "not unusual", and "regular" as commonplace in discussing what is and what is not in the ordinary course of business. *See, e.g., In re Fulgham Const. Corp.,* 872 F.2d 739 at 745 ("[t]he record unequivocally disclosed that the advances and repayments were recurring, customary and designed to keep Fulghum in business); *WJM, Inc.,* 840 F.2d 996 at 1011 ("the cornerstone of this element of a preference defense is that the creditor need demonstrate some consistency with other business transactions between the debtor and the creditor."); *In re Energy Co-op, Inc.,* 832 F.2d 997, 1004 (7th Cir.1987) ("protecting recurring, customary credit card transactions which are incurred and paid in the ordinary course of business of the debtor and the transferee."); *In re Colonial Discount Corp.,* 807 F.2d 594, 600 (7th Cir. 1986), *cert. denied,* 481 U.S. 1029, 107 S.Ct. 1954, 95 L.Ed.2d 526 (1987) ("debtor's business regularly involved large sums of money in the ordinary course of business"); *In re Craig Oil Co.,* 785 F.2d 1563 at 1566 ("purpose of the section is to protect those payments which do not result from 'usual' debt collection or payment practices.")

The record indicates that until sometime in June, 1986, all payments made to FABNY were credited to Singer's secured account, and only after learning of Singer's precarious financial condition did FABNY begin to credit 25% as against the unsecured line. (Montano T., 5/24/87 at 47) ("[t]here was, again, a subsequent letter written by them to Mr. Powers indicating our concern with the deterioration and the misstatement, if you will, in terms of financial statements given 12/31/85 and then the apparent true results happened for that year, that based upon that we did request a shifting over a stated period of time from the unsecured facility to strictly the secured facility."); (Montano T., 11/17/87 at 40–1)

("Q—When First American Bank would receive this cash or credit from the foreign bank ... what did ... [FABNY] do with the credit or money.

A—When it started out—we would credit Singer's Products' account for the proceeds.... But then in June to have the system be more precise as payments physically came in, they were physically applied against the advance account"); (FABNY Status Report dated 8/27/86 from Powers to file ("In June 1986 we were advised that Singer's 1985 financials would show a significant loss"); letter dated 7/25/86 from Powers to Singer ("As we are now being informed that a significant loss was registered in 1985, we feel misrepresentations were made"); (Memorandum dated June 11, 1986 from Taccatta to Slomka) ("Kindly apply the att'd check drawn on us against the subjects $1MM outstandings under the *unsecured* portion of the facility

($150,568.95). Also, chg [sic] Singer's acc [sic] 550–014–789 for $62,000 and reduce the same portion") (emphasis in original); (Memo dated June 23, 1986 from Montano to Powers) ("Until we get a clearer picture, and in your absence I have" 1.—"Instructed the Loan Department to apply all collection payments as received against the loan balance as opposed to our current pool arrangement"); (Cortes T., 7/9/87 at 6) ("My involvement with Singer was just basically to process the documentary collections that were furnished to us, service that, trace it, advise them of any acceptances or loss of documents whatever, and when the payments was received we liquidated the collection by crediting their account"); (Cortes T., 7/9/87 at 16) ("All I know is when we received the payment, as part of my obligation, which is to credit the account of Singer Products, advise them that the monies had been credited to their account.")

Thus, it was only after receiving such notice that FABNY began to credit 25% of Singer's payments towards the unsecured line. While this may have been prudent pre-bankruptcy planning by which FABNY sought to reduce its risk, the sudden precipitous application by FABNY of its security to this unsecured line could hardly be described as "ordinary course of business." *Fulgham*, 872 F.2d 739 at 745; *Colonial Discount Corp.*, 807 F.2d 594 at 600. The timing of the transaction dictates that the draw-down, even if otherwise proper, was not "ordinary", "usual", "recurring" or "consistent" as between this debtor and FABNY, nor was it the common practice of similarly situated entities within this industry. Rather it was a variation from what theretofore had been the usual course of dealing between FABNY and Singer, and therefore does not come within the exemption from preference set forth in § 547(c)(2). *See Production Steel, Inc. v. Sumitono Corporation of America (In re Production Steel, Inc.)*, 54 B.R. 417, 423 (Bankr.N.D.Tenn.1985).

FABNY claims that the process of debiting the outstanding loan balances at a rate of 75% secured, 25% unsecured had been intended by the parties from the inception of their relationship and that only a failure of its internal processes prevented its activation prior to June, 1986. FABNY asks that we consider the intent of the parties rather than their conduct prior to June, 1986 as the standard against which later behavior is judged in determining "ordinary course."

The § 547(c)(2)(B) "ordinary course" exception refers to the objective conduct of the parties rather than to their subjective intent. Repayments, therefore, under this line are not insulated by that sub-section.

Neither is the $62,000 balance in Singer's demand deposit account which was utilized to offset the unsecured balance exempt from preference avoidance by § 547(c)(2). As Singer properly points out, the letter agreement sets out strict criteria for repaying any balance on either line. Paragraph 2 of this agreement states in pertinent part—

[y]ou may repay such borrowing, but with accrued interest provided that each full or partial prepayment shall be at least $100,000 in principal amount upon notice to us by letter mailed the same day and signed by an authorized officer (or by telephone), shall whether upon our demand or pursuant to your notice to us by letter or telephone, shall be effected by our debiting your account....

First, this prepayment was not in increments of $100,000 or more. Second, it was used to offset the unsecured line, although as indicated above, it served only as collateral for the secured line. Third, only *after* receiving notification of Singer's precarious financial condition, did this one time, nonrecurring, non-consistent and therefore non-ordinary, setoff against the unsecured line take place.

All of the payments credited by FABNY to either Singer's secured or unsecured line within 90 days of Singer's filing are therefore voidable as preferences. An issue which neither Chemical nor Singer's Creditors' Committee has raised is the extent to which any such payments to FABNY made more than 90 days prior but within one year of Singer's filing may be preferential

**936**

if FABNY held the personal guarantee of Singer's principals. *See, e.g.,* Feit & Smolinsky, *Lenders Beware: A Principal's Guaranty is No Guarantee,* The Bankruptcy Strategist, Aug. 1989, at ——. Since neither party has raised this issue, it need not be addressed at this time.

### CHEMICAL'S ENTITLEMENT

 Chemical claims an entitlement to all repayments as proceeds of their collateral. To the extent that Singer could prevail against FABNY only by virtue of its exercise of a trustee's avoiding powers, the avoided transfer would be preserved for the benefit of the estate and not for the benefit of Chemical. 11 U.S.C. § 551. However, as we have pointed out, even had FABNY timely filed, it still would have failed due to its lack of possession of the items and Chemical's prior filing. NYUCC § 9–312. This would be so even if Singer had not filed its Title 11 case, and indeed even if Singer were not a party to this proceeding. The avoided preference, even if preserved for the benefit of the estate, would still be subbordinate to Chemical's prior in time position. Since Chemical's position vis a vis FABNY exists independent of Singer's status as a trustee, lien preservation for the benefit of the estate would be inappropriate to defeat Chemical's position.

### CONCLUSION

1. There are two lines of credit, one secured for $4,000,000, the other unsecured for $1,000,000.

2. FABNY's security interest is not protected pursuant to NYUCC Article 9.

3. FABNY is not a "collecting bank" entitled to the protections afforded such banks under NYUCC Article 4.

4. All repayments made by FABNY under both the secured and the unsecured line are voidable preferences not protected under 11 U.S.C. § 547(c)(2).

5. Chemical is entitled to the entire proceeds of the ultimate recovery.

Chemical is directed to settle an order requiring FABNY to turn over to it all sums which FABNY credited to Singer's loan balances under both lines during the 90 days preceding Singer's filing and post-petition, but only to the extent of any sums which Chemical may have advanced to Singer under their cash collateral order dated December 30, 1986, up to $220,-000.00, plus its outstanding loan balance as of August 27, 1986.